IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>SHELBY JEAN TRIPP,<br><br>                Defendant. | CR 23-125-BLG-SPW<br><br>ORDER |

Before the Court is Defendant Shelby Jean Tripp's Motion to Suppress. (Doc. 27). Tripp is charged with one count of conspiracy to possess with the intent to distribute controlled substances, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). (Doc. 3). Her charges arise out of evidence discovered when Belgrade Police Department officers responded to a request for a welfare check. (*See* Doc. 28 at 3–9, Doc. 28-1 at 1).

Tripp asks the Court to "suppress any and all evidence seized as a result of the seizure of . . . Tripp's person on March 10, 2023". (Doc. 27 at 1). The Government responded (Doc. 35), and Tripp replied (Doc. 38). Tripp requested a hearing. (Doc. 27 at 2).

The Court held an evidentiary hearing on July 12, 2024. (Doc. 46). Belgrade Police Department Sergeant Benjamin Martin, Belgrade Police Department Officer

1

Matt Jones, and Montana State Probation Officer Ashley Spragg testified. (*Id.*).  The

Court finds the material facts are not disputed based on parties' briefing (Docs. 28,

35, 38), the officers' reports (Doc 28-1 at 15–17), Sergeant Martin's body cam

footage (Doc. 30-1), Officer Jones's body cam footage (Doc. 30-2), and the

testimonies.

For the following reasons, the Court grants Tripp's motion.

## I.    Factual Background

Tripp was sentenced on October 31, 2022, to two years imprisonment.  (*See*

Doc. 28-2 at 1–2).  Her sentence was suspended.  (*See id.* at 1).  Tripp agreed to a

number of conditions of release from the Montana Office of Probation and Parole.

(Doc. 35-1 at 6–8).  Relevant here, she agreed to the following conditions:

> 5.    <u>Illegal Drug Use</u>: I will not possess or use illegal drugs. I will not
> be in control of or under the influence of illegal drugs, nor will I have
> in my possession any drug paraphernalia.
> 6.    <u>Laws & Conduct</u>: I shall comply with all city, county, state, and
> federal laws and ordinances, and conduct myself as a good citizen. . . .
> 8.    <u>No Gambling</u>: I will not gamble.
> 11.    <u>Search of Person or Property</u>: Upon reasonable suspicion, as
> ascertained by a Probation/Parole Officer, my person, vehicle, and/or
> residence may be searched at any time, day or night, including my place
> of employment, without a warrant by a Probation/Parole Officer, ISP
> Officer or Law Enforcement Officer (at the direction of the
> Probation/Parole/ISP Officer).  Any illegal property or contraband will
> be seized and may be destroyed.
> 13.    <u>Travel</u>: I will not leave my assigned district without first
> obtaining written permission from a Probation/Parole Officer.

(*Id.* at 7).

On the morning of March 10, 2023, Tripp was asleep in her car in the parking lot of the Magic Diamond Casino in Belgrade, Montana. (*See* Doc. 28-1 at 15, 17). Casino employees saw Tripp and knocked on the door of her car in an effort to wake her up. (*See id.* at 15). An employee, Tamara Olson, called the police and requested a welfare check, reporting that a man was "passed out" inside a light blue Audi. (*Id.*).

Sergeant Martin and Officer Jones from the Belgrade Police Department responded. (*Id.* at 15, 17). Sergeant Martin testified that the Magic Diamond Casino at issue is in a building that also houses a Town Pump gas station. Tripp's Audi was parked on the casino side of the building. Sergeant Martin parked perpendicular to the Audi about four parking spaces away. (Doc. 30-1 at :04). Officer Jones parked perpendicular to the Audi about four parking spaces away. (*Id.*). In his report, Sergeant Martin noted that the Magic Diamond Casino is a "high drug activity area[,]" and that someone under the influence of illicit drugs can "involuntarily fall asleep or go 'on the nod.'" (Doc. 28-1 at 15). Sergeant Martin testified that, based on the location of the Audi, he suspected possible drug use.

On arrival, Officer Jones knocked on the window of the Audi, waking up Tripp. (*Id.* at 17). Tripp unrolled her car window, and Sergeant Martin told her that he and Officer Jones were checking on her welfare. (Doc. 30-1 at 0:22–32). Tripp apologized to Sergeant Martin and said that she had "stayed up late" the previous

3

night and fallen asleep in the car. (*Id.* at 0:32–36). She said that she was "totally fine" and explained that she had visited friends and family and was headed back to Billings. (*Id.* at 0:36–46). She told Sergeant Martin that he had "startled" her. (*Id.* at 0:50–51). Sergeant Martin asked Tripp her name and whether she "ha[d] a driver's license." (*Id.* at 0:52–55). Tripp said, "yeah, I do," and handed Sergeant Martin her license. (*Id.* at 0:56–1:12). Sergeant Martin said, "I'm glad nothing serious is going on with you." (*Id.* at 1:25–27). Tripp apologized for falling asleep and said she had pulled over the night before because she "hate[d] driving tired." (*Id.* at 1:28–33).

Sergeant Martin testified that he did not smell alcohol or any other intoxicants nor see anything indicating that Tripp was under the influence of alcohol or other drugs. He did not recall that Tripp's eyes were bloodshot. He testified that, other than the location of the parked car, there was no evidence that Tripp had been inside the casino. Sergeant Martin noted that Tripp's car was "disheveled and in disarray," which he believes to be "typical of someone who consumes drugs." (Doc. 28-1 at 15). Officer Jones testified that he was not close enough to smell any intoxicants, and he did not see any drugs or alcohol.

After taking Tripp's license, Sergeant Martin told Tripp that he would be "right back." (Doc. 30-1 at 1:40–43). He walked to his car and ran Tripp's driver's license information through the National Crime Information Center database. (*Id.*

at 1:43–3:55; Doc. 28-1 at 15).  The database indicated that Tripp had a valid driver's license.  (Doc. 28-1 at 15).

While Sergeant Martin was speaking with Tripp and checking her license, Officer Jones walked around Tripp's car and looked in the passenger-side windows. (*See* Doc. 30-2 at 0:06–3:19).  Officer Jones also spoke with Tripp, first asking Tripp why she was sleeping.  (*Id.* at 1:12–18).  In response, Tripp told him that she became tired, and she does not like to drive when she's tired.  (*Id.* at 1:12–18).  Tripp asked Officer Jones whether she was allowed to sleep in the parking lot.  (*Id.* at 1:54–57). Officer Jones informed her that she was not allowed to sleep in a vehicle in Belgrade, except for the back parking lot of the Flying J.  (*Id.* at 1:57–2:12).

Sergeant Martin returned to Tripp's car.  (Doc. 30-1 at 3:56–4:10).  He asked Tripp who "Julie" is.  (*Id.* at 4:06–07).  Tripp informed Sergeant Martin that Julie is her mother.  (*Id.* at 4:08).  Sergeant Martin asked Tripp if she had come to visit her mother.  (*Id.* at 4:09–12).  Tripp seemed to answer affirmatively, then asked Sergeant Martin why he had asked.  (*Id.* at 4:13–18).  Sergeant Martin told her that "the vehicle came back, and I notice that you're not Julie, so that's why I was asking." (*Id.* at 4:19–22).  Sergeant Martin then asked Tripp if she was okay to drive and what her plan was.  (*Id.* at 4:26).  Tripp told him she was "heading to Billings right now." (*Id.* at 4:27–4:30).

Sergeant Martin then turned to Officer Jones and asked if he had "see[n] anything in the car." (*Id.* at 4:36–37). Officer Jones responded that he saw a pipe that looked unused and "one of those rubber pieces on the center console." (Doc. 30-1 at 4:38–4:43).

Sergeant Martin turned back to Tripp. (*Id.* at 4:44). Tripp reached out her hand when she saw her license. (*Id.* at 4:45). Sergeant Martin did not return Tripp's license; instead, he asked Tripp if she had "any drugs in the car at all" or anything else that she was "not supposed to have." (*Id.* at 4:45–48). Tripp pulled her hand back. (*Id.* at 4:48). In response to Sergeant Martin's question about if she had ever used drugs, Tripp responded, "Obviously you know that in the past if you looked at my record." (*Id.* at 4:49–55). Sergeant Martin told her that he had not looked at her record. (*Id.* at 4:55). Tripp told Sergeant Martin that she had been sober since last March. (*Id.* at 5:01–02). Sergeant Martin again asked her if there was anything in the car that she was not supposed to have, and Tripp responded, "no." (*Id.* at 5:03–5:07). Tripp told him that she was working and on probation in Billings. (*Id.* at 5:13–17). She told him the name of her probation officer. (*Id.* at 5:24–25). In response to Sergeant Martin's question about why she was on probation, Tripp explained that she had felony theft convictions. (*Id.* at 5:26–33).

Sergeant Martin then said to Tripp, "My partner here said that he saw a metal pipe or something in here. Do you know what that is?" (*Id.* at 5:40–44). Tripp said,

6

"It's a drinking straw." (*Id.* at 5:47–49). Tripp showed both officers what Officer Jones believed to be a pipe, which turned out to be a metal drinking straw with a rubber piece that would fit on the end. (*Id.* at 5:47–58).

Sergeant Martin testified on cross-examination that it was "unknown at that time" whether the straw was used for drug paraphernalia. Officer Jones testified that he had seen straws used to consume drugs off of foil. On cross-examination, Officer Jones clarified that he "s[aw] a straw that [he] believe[d] was possibly going to be used for dangerous drugs." He further explained that the straw was clean—meaning without residue—but would not concede that a straw without residue was probably not drug paraphernalia.

Sergeant Martin testified that he then decided to contact Montana Probation and Parole because Tripp was parked outside a casino and became visibly nervous when asked about drugs. Sergeant Martin returned to his car, called Tripp's probation officer, and left a message. (*Id.* at 6:19–10:36). He reported that Tripp was "passed out" in her vehicle and was "acting a little funny." (*Id.* at 10:11–19). He then telephoned the probation office in Bozeman and asked if the office "had any control over Billings people." (*Id.* at 10:49–11:14). He told Probation Officer Ashley Spragg the following:

> [S]o this lady from Billings, Shelby Tripp, is on probation with Lillian Ahern in Billings. We got called in for a welfare check. She was passed out at the Magic Diamond. Reporting person says they knocked on the door, and she couldn't, she wouldn't wake up. She was more lucid when

7

we showed up, but—I don't know—she was really nervous when I asked about drugs. Being at a casino here, it's pretty typical. I didn't know, being a probation officer, if you wanted us to do anything with that as far as searching her vehicle.

(*Id.* at 11:18–11:55). In response to a question asked by Officer Spragg, Sergeant Martin responded, "Yeah, the Conweb says that she is." (*Id.* at 12:05–07). He clarified the spelling of Tripp's name and then told Officer Spragg,

She's alright. I mean,—she's almost like—her eyes started watering up and [she] got really nervous when I asked about drugs in the vehicle. She has a bunch of stuff in there, but nothing in, like, plain view. But, she's lucid. She's talking normally. I don't think that, I don't know. As far as impairment goes with DUI, we aren't going that route with her because I don't have enough for that.

(*Id.* at 12:10–53). Officer Spragg spoke, and Sergeant Martin responded, "Oh yeah." (*Id.* at 12:54–13:01).

Officer Spragg testified that she was the probation officer on call when Sergeant Martin called. Officer Spragg explained that when she receives a call from a police officer, she looks in one of two locations to determine if a person is on probation or parole. One of those programs, Chrono, provides the probation officer with a list of all notes about a probationer in chronological order. Relevant here, Chrono shows if a probationer has a travel pass. The other program, ConWeb, does not. Officer Spragg testified that she did not remember which program she used to search for Tripp, and she could not say for certain she was aware that there was not

a travel permit when she authorized the search because she could not say she accessed Tripp's Chronos during Sergeant Martin's call.

After confirming that Tripp was on probation, Officer Spragg authorized a search of both Tripp's person and vehicle, pursuant to the terms of Tripp's supervision. (Doc. 28-1 at 15). Officer Spragg testified that she was primarily concerned about Tripp's illegal drug use, since casinos in Montana are known for illegal drug use. Officer Spragg testified that she based her authorization to search on the following facts: (1) Tripp was sleeping in her car by a casino, and (2) Tripp became nervous when she was asked about drugs.

After the call ended, Sergeant Martin returned to Tripp's car and told her that he had spoken with the probation office, and "they want you to step out of the vehicle. They want me to search your person and your vehicle." (*Id.* at 13:24–48).

In subsequent searches by Sergeant Martin and Officer Jones, and by detention officers at the Gallatin County Detention Center, officers found suspected fentanyl residue on aluminum foil and tubes in the car; $1,586 in cash, 405 fentanyl pills, and 9.5 grams of methamphetamine on her person; and small jeweler's bags in her purse, which Sergeant Martin believed to be used for packaging drugs for sale. (Doc. 28-1 at 15–16, 18–22).

On October 19, 2023, Tripp was charged in this Court with one count of conspiracy to possess with the intent to distribute controlled substances, in violation

of 21 U.S.C. § 846, and one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). (Doc. 3).

## II.    Legal Standard

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. The Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)). The government bears the burden of showing that a warrantless search or seizure does not violate the Fourth Amendment. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant" supported by probable cause. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). A search without a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Relevant here, the

exceptions include consensual encounters, *Florida v. Bostock*, 501 U.S. 429, 434 (1991); brief stops and frisks, *Terry v. Ohio*, 392 U.S. 1, 20–24 (1968); and probation searches, *United States v. Knights*, 534 U.S. 112, 120–21 (2001).

## III.  Discussion

The parties generally disagree on two fundamental issues: (1) when the interaction between Tripp and the officers became a seizure, and (2) whether, when Tripp was seized, Sergeant Martin had the proper authority to effectuate the seizure.

Tripp first argues that officers exceeded the permissible scope of the community caretaker exception when they seized her and her car. (Doc. 28 at 10–11). Second, officers did not have particularized suspicion to seize and search Tripp, as required by *Terry*. (*Id.* at 12–16). Third, Probation Officer Spragg did not have sufficient grounds to authorize a search of Tripp and her car. (*Id.* at 16–18). Finally, Tripp asserts that, as the seizure and search of Tripp and her car violated the Fourth Amendment, all evidence derived from the seizure and search should be suppressed. (*Id.* at 18–19).

In response, the Government argues that Tripp was not seized when the officers initially encountered her. (Doc. 35 at 6). Officers did not box her in or show physical force or authority. (*Id.*). The Government next asserts the officer's request to see Tripp's driver's license was not a Fourth Amendment seizure because Tripp voluntarily provided the license. (*Id.* at 7). The Government finally argues that the

police had reasonable suspicion that Tripp was engaged in criminal activity, namely driving under the influence, because Tripp was "passed out behind the wheel" in a casino parking lot and "the officers were concerned that she was using drugs." (*Id.*).

On reply, Tripp argues that she was seized within the meaning of the Fourth Amendment when officers "converged" on her vehicle. (Doc. 38 at 3). Tripp next argues that she continued to be seized when officers kept her driver's license after finding that it was valid and when officers continued to ask her questions at this point. (*Id.* at 4). Officers did not have reasonable suspicion to justify the continued seizure. (*Id.* at 5–6).

The Court will address the constitutional issues as they arise chronologically in the encounter.

### A.    *Officers Approach Tripp for a Welfare Check*

The encounter between officers and Tripp began with a call for a welfare check. At this point, the Government asserts that the stop was "not an investigatory stop," but some kind of voluntary exchange between police and Tripp. (Doc. 35 at 2). Tripp argues that the exchange exceeded the bounds of the community caretaker exception. (Doc. 28 at 10, 14–15).

The Court finds that the "welfare check" encounter between the officers and Tripp was consensual, so no reasonable suspicion was required. *See Bostock*, 501 U.S. at 434 ("So long as a reasonable person would feel free to disregard the police

and go about his business, the encounter is consensual and no reasonable suspicion is required.") (internal citations and quotation marks omitted).

Not every interaction between the police and citizens amounts to a seizure within the meaning of the Fourth Amendment. *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984). Here, the officers began the encounter by knocking on the window of Tripp's car to see if she was okay. Tripp briefly spoke with the officers about how she fell asleep and planned to return to Billings. Accordingly, the initial conversation between Tripp and the officers was a consensual encounter that occurred during the day and in public view, and Tripp was not seized. *See United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.").

Because there was no seizure at this point, the Court finds the community caretaker exception to the warrant requirement inapplicable.[1]

---

1. Even if there was a seizure at this point in the encounter, the Supreme Court and Ninth Circuit have only applied the community caretaker exception in cases involving the impoundment of vehicles for "community caretaking" reasons—those that are outside the enforcement of criminal statutes. *See, e.g., Cady v. Dombrowski*, 413 U.S. 433, 439–441 (1983) (discussing the exception within the context of automobile searches); *Miranda v. City of Cornelius*, 429 F.3d 858, 860 (9th Cir. 2005) (explaining that "[g]enerally, the community caretaking doctrine allows the police to impound where necessary to ensure that the location or operation of vehicles does not jeopardize the public safety."); *United States v. Porche*, 616 F. Supp. 3d 1068, 1074 (D. Mont. 2022) ("[T]he [community caretaker] doctrine has not been readily applied to new contexts—meaning those that do not directly involve the impoundment of an automobile for community caretaking reasons.") The Court declines to expand the doctrine here.

13

B.     *Tripp Provides Officers with Her Driver's License, Sergeant Martin Runs Tripp's License, then Speaks with Officer Jones*

Next, Sergeant Martin asked Tripp if she had a driver's license, which the Court construes as a request to produce a driver's license or other identification. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humbolt County*, 542 U.S. 177, 181 (2004). In response, Tripp handed Sergeant Martin her license.

Questioning regarding an individual's "identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Delgado*, 466 U.S. at 216. Without more, "police questioning, by itself, is unlikely to result in a Fourth Amendment violation," because a citizen need only respond if they consent to the interaction. *Id.*

Thus, the mere request for identification does not automatically change a consensual interaction into an investigatory stop.   Whether a request for identification becomes an investigatory stop and thus requires reasonable suspicion depends on the response of the suspect. *See id.* In *Delgado*, the Supreme Court identified two types of responses. *Id.* at 216–17.  First, when a suspect voluntarily provides their identification, a Fourth Amendment violation has not occurred "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not

---

responded[.]" *Id.* at 216. Second, when a suspect refuses an officer's request to identify himself, the police must have reasonable suspicion to continue to detain a person for the purpose of checking for identification. *Id.* at 216–17 (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979) (finding that when police detained a suspect who refused to identify himself, the state was required to show reasonable suspicion that the suspect was involved in criminal conduct)).

The conduct at issue here is of the first type. In response to Sergeant Martin's request, Tripp provided her license. As such, Sergeant Martin's actions did not implicate the Fourth Amendment unless "the circumstances of the encounter [became] so intimidating as to demonstrate that a reasonable person would have believed that he was not free to leave if he had not responded." *See id.* at 216. Because neither officer displayed a firearm, nobody was handcuffed or otherwise restrained, neither police vehicle blocked Tripp's Audi, and Tripp freely spoke with the officers, the encounter was not intimidating. Sergeant Martin did not need reasonable suspicion to check Tripp's license.

Tripp argues that, at this point in the encounter, Sergeant Martin unlawfully prolonged the encounter without reasonable suspicion. (Doc. 28 at 14–15; Doc. 38 at 10). Citing the Supreme Court's decision in *Rodriguez*, she argues that the encounter began as a welfare check, and the officers' questions should have been limited in scope to those reasonably asked during a welfare check. (Doc. 28 at 14;

Doc. 38 at 10 (citing *Rodriguez v. United States*, 575 U.S. 348, 349–350 (2015))).[2] The Government does not respond to this argument.

The Court finds the stop was not unlawfully prolonged.

In *Rodriguez*, the Supreme Court considered whether an officer unreasonably prolonged a traffic stop in violation of the Fourth Amendment when he extended the time of the traffic stop so a dog could sniff the car. *Rodriguez*, 575 U.S. at 350. The Court found that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* at 354. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. Accordingly, an officer's inquiries during a traffic stop are constitutionally permissible if they are "(1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019). The prolonging of a stop by even 20 seconds must be supported by independent reasonable suspicion. *See United States v. Nault*, 41 F.4th 1073, 1077 n.2 (9th Cir. 2022) (recognizing that "courts have found stops unconstitutional when

---

2. Tripp characterizes the stop as an "community caretaker stop," but as the Court has rejected that categorization, the Court construes Tripp's argument as Sergeant Martin unlawfully prolonged the stop because it should have been limited in scope to the purposes of the welfare check.

prolonged by under thirty seconds before officers developed independent suspicion").

The Court cannot find, and the parties do not cite, a case where a court applied the reasoning of *Rodriguez* outside of the traffic stop context. However, even if the Court applies the approach in *Rodriguez* to this case, it finds that the stop was not unlawfully prolonged. Both officers described the encounter as a "welfare check" to check on a person "passed out" inside a vehicle. (*See* Doc. 28-1 at 15, 17). Because Fourth Amendment analysis is guided by "reasonableness," *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), the Court finds it reasonable that, before returning Tripp's license, the mission of the stop included officers ascertaining whether Tripp needed medical attention, checking that whatever caused her to pull over in the first place was resolved, and ensuring that she could safely continue driving. Part of safely (and legally) continuing to drive involves confirming Tripp has a valid driver's license.

Sergeant Martin's questions when he returned to Tripp's car fell within the scope of this mission. Sergeant Martin asked Tripp the identity of Julie (the owner of the car), what Tripp was doing before she pulled over, whether Tripp was "okay to drive," and what her plan was. Additionally, when Sergeant Martin asked Officer Jones if he had "see[n] anything in the car," he was reasonably ensuring that there was nothing in the car to impair Tripp's ability to drive.

17

Accordingly, Tripp was not seized by officers at this point, and the stop was not unlawfully prolonged.

C.    *Sergeant Martin Questions Tripp About Drug Paraphernalia and Drug Possession*

After speaking with Officer Jones, Sergeant Martin turned back to Tripp, who then reached out for her license.  Sergeant Martin did not return Tripp's license to her.  Instead, Sergeant Martin began asking Tripp about her drug use.  At that point, the tenor of the encounter changed, with the questions changing from those that police would reasonably ask during a check of a person sleeping in their vehicle—was Tripp okay, where was Tripp was headed, why Tripp stopped, and who owned the car—to those police ask in the process of an investigation—whether Tripp had drugs in her possession.  Further, when Sergeant Martin did not return Tripp's license, Tripp knew that she could not drive away without violating Montana law.  *See Porche*, 616 F. Supp. 3d at 1076 ("What was [the suspect] supposed to do [after officers held his driver's license]—get into his van, effectuate the turn-around maneuver necessary to exit the park through the narrow gap left by [the] patrol vehicle, abandoning his driver's license (knowing that the continued operation of a motor vehicle without it may very well violate the traffic code of wherever he went)?")

At this moment, the encounter became intimidating, and a reasonable person in Tripp's situation would not feel free to leave.  The encounter thus ripened into a

*Terry*, or investigative, stop, which required reasonable suspicion that Tripp was engaged in criminal activity.

When a consensual encounter "ripen[s] into an investigatory detention under *Terry*, then the officer must have reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) (quoting *Heien*, 574 U.S. at 60 (2014) (internal quotation marks omitted). That suspicion must be based on the totality of the circumstances and particularized to the person being stopped. *Id.* at 1005–06 (internal citations omitted). Any investigative methods employed must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel*, 542 U.S. at 185 (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)). During the investigatory stop, the officer "make[s] 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (*quoting Terry*, 392 U.S. at 30).

The Court assesses the totality of the circumstances surrounding the stop to determine whether an officer possessed reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The Court evaluates the totality of circumstances objectively and disregards an officer's subjectivity. *See United States v. Willis*, 431 F.3d 709, 716 (9th Cir. 2005).

Here, Sergeant Martin's questions indicate that he was pursuing two related lines of inquiry—whether Tripp possessed either drug paraphernalia (the "metal pipe") and/or drugs.[3]  The Court will analyze whether reasonable suspicion existed for each in turn.

### a.    Drug Paraphernalia

Section 45-10-103 of the Montana Code Annotated makes possessing drug paraphernalia "with intent to use drug paraphernalia to . . . inject, ingest, inhale, or otherwise introduce into the human body a dangerous drug" a misdemeanor offense. Drug paraphernalia is defined as

> all equipment, products, and materials of any kind that are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a dangerous drug.

Mont. Code Ann. § 45-10-101(1).  In deciding what constitutes drug paraphernalia, the Montana Code provides a non-exclusive list of items.  *Id.*  The Code also provides a number of factors for an authority to consider when determining whether an item is drug paraphernalia, including: statements by an owner or by anyone in

---

3. While Sergeant Martin may have initially suspected that Tripp was driving under the influence, he informed Officer Spragg that he did not have enough evidence to pursue a DUI charge. Additionally, Sergeant Martin noted that Tripp was lucid and did not ask Tripp any questions about driving under the influence.  Because the scope of his investigation must be "carefully tailored to its underlying justification," the Court concludes that Sergeant Martin was not investigating Tripp for possible DUI when he asked Tripp about drugs.  *See Royer*, 460 U.S. at 500.

control of the object concerning its use; prior convictions, if any, of an owner or of anyone in control of the object under any state or federal law relating to any controlled substance or dangerous drug; the proximity of the object to dangerous drugs; the existence of any residue of dangerous drugs on the object; the manner in which the object is displayed for sale; and the existence and scope of legitimate uses for the object in the community. *Id.* § 45-10-102(1), (2), (4), (5), (10), (13).

Sergeant Martin considered the following facts when he began investigating Tripp for possession of drug paraphernalia. First, the Magic Diamond Casino is a high drug activity area. (Doc. 28-1 at 15). The Court accepts this description because it is limited to a certain type of establishment and geography—Belgrade casinos in general, and specifically the Magic Diamond Casino—and is supported by Sergeant Martin's experience. Second, Officer Jones informed Sergeant Martin that he had seen what he believed to be drug paraphernalia on the console of Tripp's car. (*Id.*). Viewed together, the above facts provided Sergeant Martin with reasonable suspicion that Tripp was engaged in possession of drug paraphernalia in violation of Montana law, and Sergeant Martin could extend his investigatory stop to confirm or dispel his suspicions.

However, Officer Jones's and Martin's suspicions were dispelled once Tripp showed Sergeant Martin that the alleged drug paraphernalia was a drinking straw. None of the relevant factors in §45-10-102 lean in favor of the officers believing the

straw was being used as drug paraphernalia. Tripp called the straw a "drinking straw"; Sergeant Martin had no evidence that she had been convicted of a drug offense; there was no indication that the straw was in proximity to any drugs; there was no residue on the straw, as evidenced by Officer Jones referring to it as a "clean" straw; and metal drinking straws are widely used for drinking liquids. *See* Mont. Code Ann. § 45-10-102(1), (2), (4), (5), (13). Beyond insisting that a straw can be used for the ingestion of drugs, the officers did not explain why they continued to believe that the straw was paraphernalia.[4] Given the totality of the circumstances, an objectively reasonable police officer would not have believed that the straw was being used for anything besides "sucking up liquid." *See Straw, Merriam-Webster.com*, https://perma.cc/QV4E-U96E (last visited Jul. 24, 2024).

Accordingly, once Tripp showed Sergeant Martin the clean drinking straw, he no longer had reasonable suspicion that she was engaged in criminal activity in violation of Montana Code Annotated § 45-10-103.

  *b.*  *Drug Possession*

The Court now considers whether, after dispelling his suspicion that Tripp was in possession of drug paraphernalia, Sergeant Martin had reasonable suspicion that Tripp was in possession of dangerous drugs.

---

4. The Court notes that, when Sergeant Martin called Officer Spragg to receive approval to search Tripp and her vehicle, he did not tell her about the possible drug paraphernalia, which would have provided Officer Spragg with more reason to approve the search, indicating that Sergeant Martin did not believe the drinking straw was drug paraphernalia.

Section 45-9-102 of the Montana Code Annotated makes illegal the possession of dangerous drugs. Section 45-9-103 makes illegal the possession of dangerous drugs with the intent to distribute.[5]

Sergeant Martin knew the following relevant facts when he began investigating Tripp for a violation of §§ 45-9-102, 103. First, as explained above, the Court accepts that the Magic Diamond Casino is a high drug activity area. Second, Sergeant Martin knew from his training and experience that people using illicit drugs can involuntarily fall asleep. Third, Sergeant Martin noted that the condition of Tripp's vehicle, which he described as "disheveled and in disarray," was typical of someone who consumes drugs. Fourth, Sergeant Martin noted that Tripp was nervous when asked about drug use. Fifth, Sergeant Martin knew that Tripp was on probation for felony theft. Sixth, neither officer noticed the smell of alcohol or other intoxicants, like marijuana and meth, in Tripp's vehicle. Seventh, Sergeant Martin reported that Tripp was "understandable," did not slur her words, was quick to locate her license, and did not otherwise display any indication that she was under the influence of alcohol or other drugs. Eighth, Sergeant Martin later stated to Officer Spragg that he did not have enough evidence that Tripp was impaired to pursue a DUI investigation.

---

5. The code provides exceptions in §§ 45-9-102(1), 103(1) for marijuana, which do not apply here.

The Court finds the totality of the circumstances insufficient to provide Sergeant Martin with reasonable suspicion that Tripp was in possession of dangerous drugs.

First, while the casino is a high drug activity area, Sergeant Martin's bodycam footage shows that Tripp was sleeping in her car parked at the back of the lot that is located adjacent to a freeway. (*See* Doc. 18-1 at 0:02–10). Such a location generally provides long-distance travelers with a place to rest when drowsy, which the State of Montana encourages as a matter of public policy (even if the City of Belgrade makes it difficult to do so by restricting where people can "camp"). *See Mont. Dep't. of Justice Motor Vehicle Div.*, *Montana Driver Manual* 55 (2024) ("If you become drowsy, pull off the road and take a nap, or better yet, find a room for the night. It's better to arrive at your destination.").

Second, while Sergeant Martin noted that, in his experience, people under the influence tend to fall asleep and the condition of Tripp's car was characteristic of someone using drugs, his experience did not seem to apply to Tripp, as he testified that Tripp was lucid and did not appear under the influence. Sergeant Martin conveyed his observations in his statement to Officer Spragg that he did not have sufficient evidence of intoxication to pursue a driving under the influence charge.

Third, while an officer can consider prior criminal activity in formulating reasonable suspicion, *Burrell v. McIlroy*, 464 F.3d 853, 858 n.3 (9th Cir. 2006), a

24

felony theft conviction has limited relevance to whether a person is in possession of illegal drugs. The Court accords this factor little weight in the overall analysis.

Finally, based on Sergeant Martin's bodycam video, officer reports, and Sergeant Martin's testimony, the Court finds that while Tripp may have appeared nervous during the stop, she was not demonstrably more nervous than a person would ordinarily be when stopped by the police and questioned about illegal activity.

The Court concludes the officers did not have reasonable suspicion that Tripp was in possession of dangerous drugs.

Accordingly, after considering the totality of the circumstances, the Court finds that once Sergeant Martin knew that the alleged drug paraphernalia was a metal straw, Sergeant Martin did not have reasonable suspicion of either possession of drugs or drug paraphernalia to continue his *Terry* stop of Tripp.

D.    *Sergeant Martin Calls Officer Spragg and Receives Consent from Probation Officer Spragg to Search Tripp*

Because Sergeant Martin discovered that Tripp was on probation before his investigation dispelled his reasonable suspicion that Tripp was in possession of drug paraphernalia, the Court must next determine whether the information Sergeant Martin provided to Officer Spragg gave Officer Spragg reasonable suspicion that Tripp was engaged in criminal activity and to authorize a search of Tripp under the conditions of her probation.

"[B]y virtue of their status alone, probationers 'do not enjoy the absolute liberty to which every citizen is entitled[.]'" *Samson v. California*, 547 U.S. 843, 848–49 (2006) (quoting *Knights*, 534 U.S. at 119). "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Knights*, 534 U.S. at 121. However, a condition of probation allowing a warrantless search "does not by itself render lawful an otherwise unconstitutional search of a probationer's person or property." *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). The meaning of a state term of probation is a question of state law. *United States v. King*, 736 F.3d 805, 806 n.3 (9th Cir. 2013).

In Montana, "a probation officer may search a probationer's person, vehicle, and residence and the probationer 'must submit to such search,' upon the probation officer's 'reasonable suspicion that the offender has violated the conditions of supervision.'" *Montana v. Conley*, 415 P.3d 473, 476 (Mont. 2018) (quoting Admin. R. Mont. 20.7.1101(7)).[6] A law enforcement officer may conduct a probation search

---

6. The Court notes the discrepancy between the language regarding the basis for reasonable suspicion in the probation conditions that Tripp signed and the standard conditions as outlined in the Administrative Rules of Montana. The Court notes that the Administrative Rules of Montana specify the necessity for a basis for reasonable suspicion (being that the offender has violated the conditions of supervision), while the conditions Tripp signed do not. *Compare* Admin. R. Mont. 20.7.1101(7) with Doc. 35-1 at 7. The discrepancy is unimportant here.

on behalf of probation officers if the search is otherwise lawful. *Montana v. Fritz*, 142 P.3d 806, 809 (Mont. 2006).

Tripp argues that Sergeant Martin did not provide Officer Spragg with sufficient information to constitute reasonable suspicion. (Doc. 28 at 17). Specifically, Tripp asserts that, on their own, Tripp sleeping in the parking lot of the Magic Diamond Casino and becoming nervous when asked about drugs are insufficient to constitute reasonable suspicion. (*Id.*). Tripp argues that nervousness is common in interactions with law enforcement, and she had been awakened and was uncertain of the direction the encounter was going. (*Id.* at 18).

The Government responds that Sergeant Martin provided sufficient information to the probation officer that Tripp was "involved in drug use" in violation of Montana law. (See Doc. 35 at 8–9). Specifically, the Government argues that Tripp was in a high drug activity area, and Sergeant Martin believed Tripp was using drugs because, when asked about drugs, Tripp became nervous and her eyes started to water. (*Id.*). The Government asserts that these facts provide reasonable suspicion that she was using drugs. (*Id.* at 9). The Government next argues that Sergeant Martin provided sufficient information to the probation officer that Tripp was in violation of the condition of her probation that she could not gamble. (*See id.*). Finally, the Government argues that Tripp was in violation of her condition that she could not leave her assigned district without obtaining written

27

permission from her probation officer, so when the probation officer heard that Tripp was in Belgrade, she had reasonable suspicion that Tripp was in violation of the conditions of her probation. (*Id.* at 9–10).

On reply, Tripp argues that the only information Sergeant Martin provided to the probation officer had to do with drugs, not with gambling or whether she was traveling out of district. (Doc. 38 at 12). Further, the supposition that she was outside her probation district was "merely a hunch," and Sergeant Martin did not ask the probation officer or Tripp whether she had obtained a travel permit. (*Id.* at 12). Finally, the Government's argument that Tripp was gambling was based solely upon the call requesting a welfare check, and the fact that her car was in a parking lot is "an unwarranted inference." (*Id.* at 12–13).

The Court will address each argument in turn.

First, the Court agrees with Tripp that the fact that her car was parked in the parking lot of the casino/bar/convenience store complex is insufficient to give the probation officer reasonable suspicion that she was gambling in violation of her conditions of supervision. Sergeant Martin's bodycam footage shows that Tripp was parked at the back of the lot, not in any of the available spots next to the casino entrance. (*See* Doc. 30-1 at 0:02–10). Tripp was sleeping, not gambling, when the officers approached her car, and Sergeant Martin testified that, aside from the

location of her car in the parking lot, he had no evidence that Tripp had been inside the casino.

The Court also agrees with Tripp about the potential probation violation based on her being out-of-district without permission. During her testimony, Officer Spragg could not remember which program she checked when asked about Tripp's probation status, so she could not definitively state that she knew Tripp did not have a travel pass. Additionally, the Government presented no evidence that Officer Spragg considered Tripp's location when giving consent to search her. The Government cannot provide post hoc justification in its briefs to rationalize the actions of an officer. *See Hiibel*, 542 U.S. at 185 ("The officer's action must be justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place.") (internal citations and quotation marks omitted); *see also United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011) ("[T]he Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband."). Finally, the Government has not provided a legal basis for the proposition that, in Montana, a suspicion of a probationer leaving her district authorizes a probation officer to search a probationer and her car for evidence of drug use. Montana law requires that a search of a probationer must be "limited in scope to the reasonable suspicion that justified it in the first instance except to the extent that [a] new or additional cause may arise

29

within the lawful scope of the initial search." *Montana v. Mefford*, 517 P.3d 210, 221 (Mont. 2022) (quoting *Montana v. Peoples*, 502 P.3d 129, 140–41 (Mont. 2022)). To prove that Tripp was in violation of a condition that she may not travel out-of-district, the officers only needed evidence of the location of Tripp's person, which they had. A search of Tripp and her property would not uncover additional evidence of the travel violation.

As to the suspected drug use, the Court agrees with Tripp that Officer Spragg did not possess reasonable suspicion to search Tripp for being in possession of illegal drugs. Officer Spragg testified that she considered the following two factors when she decided to authorize the search of Tripp and her vehicle: (1) Tripp was sleeping by a casino, which Officer Spragg knows to be a "high drug use" location, and (2) Tripp became nervous when asked about drugs. These factors are insufficient on their own—and when considered together—to establish reasonable suspicion of drug possession. As explained above, Tripp was asleep in a car parked in the back of the lot, adjacent to the freeway. Additionally, nothing in Sergeant Martin's body cam showed Tripp exhibiting more nervousness than any other person who is stopped by police, especially when the conversation shifted to questions about drug use.

*United States v. Cole* is factually analogous and, though not binding, persuasive. 445 F. Supp. 3d 484 (N.D. Cal. 2020). In *Cole*, officers pulled into a

parking lot at a liquor store that officers knew to be a gang hangout. *Id.* at 486. In the parking lot, the officers saw the suspect, whom they recognized as a known gang member on probation for a felony conviction. *Id.* The officers searched a database and found that the conditions of the suspect's probation required the suspect to "[s]ubmit to search and seizure by any Probation Officer, or any law enforcement officer . . . with or without a search warrant[.]" *Id.* The officers saw the suspect glance at them "continuously and nervously" while carrying a black bag with "the outline of a long rigid object" that officers suspected was a firearm. *Id.* In the subsequent stop and search, the officers found two small baggies of marijuana and a firearm. *Id.* At an evidentiary hearing, the officers conceded that the "long rigid object" could have been a book or a water bottle. *Id.* at 487.

In its analysis, the *Cole* court gave weight to the location as a "high crime area" and to the suspect's gang membership and criminal history, but found that, without more, these factors did not provide the officers with the basis for a lawful search. *Id.* at 488–89. The court further found that being nervous and holding a bag with the "outline of a long rigid object" were not "sufficient to tip the scale in favor of a finding of reasonable suspicion." *Id.*

Likewise, in this case, Officer Spragg knew that Tripp was a probationer who was nervous and parked in a casino parking lot. However, these factors are insufficient "to tip the scale in favor of finding reasonable suspicion" of drug

31

possession. *See id.* at 489. Accordingly, when the officers searched Tripp and her vehicle, they did so in violation of her Fourth Amendment rights.

E. *Exclusionary Rule*

The Court finds suppression of the evidence is warranted as a remedy for the violation of Tripp's constitutional rights and to deter future illegal searches and seizures by the police. Thus, any evidence obtained as a result of the search of Tripp is suppressed. *See Wong Sun*, 371 U.S. at 484–85.

**III.  Conclusion**

IT IS SO ORDERED that Defendant Shelby Jean Tripp's Motion to Suppress (Doc. 27) is GRANTED.

DATED this ___6th___ day of August, 2024.

SUSAN P. WATTERS
United States District Judge

32